MERRICK B. GARLAND
Attorney General
RANDY S. GROSSMAN
United States Attorney
MICHAEL G. WHEAT, CBN 118598
JOSEPH J.M. ORABONA, CBN 223317
JANAKI G. CHOPRA, CBN 272246
COLIN M. MCDONALD, CBN 286561
ANDREW Y. CHIANG, NYBN 4765012
Special Attorneys of the United States
880 Front Street, Room 6293
San Diego, CA 92101
619-546-8437/7951/8817/9144/8756
michael.wheat@usdoj.gov

Attorneys for the United States of America

# UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>KEITH MITSUYOSHI KANESHIRO (1),<br>DENNIS KUNIYUKI MITSUNAGA (2),<br>TERRI ANN OTANI (3),<br>AARON SHUNICHI FUJII (4),<br>CHAD MICHAEL MCDONALD (5),<br>SHERI JEAN TANAKA (6),<br><br>                    Defendants. | CR No. 22-00048-JMS-WRP-6<br><br>UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT SHERI J. TANAKA'S MOTION FOR BILL OF PARTICULARS, ECF No. 103<br><br>Date:   November 30, 2022<br>Time:   9:00 a.m.<br>Judge:  Hon. Wes Reber Porter |

The United States of America, through its counsel, hereby files its response in

opposition to Defendant Sheri Jean Tanaka's motion for a bill of particulars. For the

reasons outlined below, Tanaka's motion should be denied.

<u>Background</u>

A.     The Facts

On September 8, 2022, the Grand Jury for the District of Hawaii returned a First Superseding Indictment ("FSI") against Sheri Jean Tanaka and five other defendants, alleging conspiracy to commit honest services fraud and federal program bribery under 18 U.S.C. § 371 and conspiracy against rights in violation of 18 U.S.C. § 241. Through 18 paragraphs of "Introductory Allegations," multiple subparagraphs describing the "Manner and Means" of the conspiracy, and 52 overt acts, the FSI describes the efforts of Tanaka and others at Mitsunaga and Associates, Inc. ("MAI") to intimidate, oppress, silence, and retaliate against former MAI employee L.J.M. Their primary tool of oppression was the criminal justice system, which—for about $50,000 in bribes to Honolulu Prosecuting Attorney Keith Kaneshiro—they activated against L.J.M. after she claimed employment discrimination against MAI. With Kaneshiro pulling the necessary levers on behalf of MAI, the Department of the Prosecuting Attorney ("DPA") charged L.J.M. with multiple felony theft offenses. As a result, L.J.M. was arrested, booked, and released on bond. The charges loomed over L.J.M. for several years until a state court dismissed the case with prejudice, finding a lack of probable cause and significant irregularities in the investigation and prosecution. For instance, the state court observed that Kaneshiro's office "was little more than acting as the recipient of, and conduit for, MAI's submissions." FSI ¶ 17.

Over the span of twenty-one pages, the FSI lays out the United States' theory of prosecution in detail. Specifically, the FSI describes how, in November 2011, MAI fired L.J.M. without explanation and tried repeatedly to prevent her from receiving unemployment benefits. FSI ¶ 8. In August 2012, in the midst of MAI's campaign to prevent MAI from receiving unemployment benefits, L.J.M. sued MAI in federal court, alleging employment discrimination claims under Title VII and the Age Discrimination in Employment Act ("ADEA"). FSI ¶ 10. Just six weeks later, defendants Dennis Mitsunaga and Tanaka (MAI's CEO and attorney, respectively), met with Kaneshiro[1] to "attempt to persuade Kaneshiro to investigate and prosecute L.J.M" for alleged theft.[2] FSI ¶ 11. Then, within *three weeks* of that meeting, "Mitsunaga and other co-conspirators and affiliates ["MAI Donors"] began contributing money towards Kaneshiro's re-election campaigns for Honolulu Prosecuting Attorney." FSI ¶ 12. Over the next four years, between October 2012 and October 2016, the MAI Donors "contributed approximately over $45,000 to Kaneshiro's re-election campaigns." *Id.* "Prior to the first contributions reported in October 2012, the MAI Donors had no known contributions to Kaneshiro." *Id.*

---

[1] Witness testimony will establish it was highly unusual for a private citizen to gain such an audience with the Honolulu Prosecutor.

[2] "In general terms, MAI's allegation against L.J.M. was that she committed theft by billing time to MAI while working unauthorized 'side jobs,' and using MAI resources (such as e-mail and phone) to work the alleged unauthorized 'side jobs.'" FSR ¶ 11. As trial will establish, there was no probable cause for such claims.

In the meantime, with the quid flowing to his campaign coffers, Kaneshiro supplied the quo: "In exchange for the campaign contributions given to him by [his co-conspirators], Kaneshiro would agree to take official action and exercise his authority as the Prosecuting Attorney . . . to open an investigation into and prosecute former MAI employee L.J.M." FSI ¶ 21(3). Of the thousands of cases in the DPA —including murders, assaults, and burglaries, etc.—Kaneshiro took a keen personal interest in L.J.M.'s theft case, communicating directly with Mitsunaga and Tanaka by phone, FSI ¶¶ 21(8), (21)-(22), personally requesting materials from MAI about L.J.M., FSI ¶¶ 21(4), (6), (13), (23), (24), and meeting with Mitsunaga and Tanaka for lunch, FSI ¶ 21(10)-(11).[3]

The scheme hit a major roadblock in the summer of 2014. At that time, a senior prosecutor recommended declining the L.J.M. case. FSI ¶ 21(26). When Tanaka expressed her disagreement with that conclusion, *id.*, Kaneshiro dutifully kept the case open and alive by reassigning L.J.M.'s case to a recently hired prosecutor assigned to the Career Criminal Unit of the DPA.[4] FSI ¶ 21(27). Within several months, armed with material supplied by Tanaka—including misleading declarations, FSI ¶ 21(34), (36)—the new prosecutor filed a felony information against L.J.M. However, the felony information was rejected by the state court

---

[3] Just days after the lunch, Kaneshiro's campaign reported $10,000 in contributions from Mitsunaga, Mitsunaga's spouse, and defendant Terri Ann Otani. FSI ¶ 21(12).
[4] L.J.M. was not a career criminal.

"because there was no law enforcement affidavit accompanying" it.[5] FSI ¶ 21(39). Once again, Kaneshiro stepped in and assigned DPA Investigator Vernon Branco to sign the affidavit necessary to charge L.J.M. FSI ¶ 21(40).

With Branco's declaration in tow (and still using the declarations from Otani, McDonald, and Fujii), on or around December 1, 2014, the DPA charged L.J.M. with four counts of second-degree theft. FSI ¶ 21(42). The declarations filed to support the prosecution are filled with misleading, false, and deceptive statements. For example, Otani's declaration was designed to support MAI's claims that L.J.M. took money from Dennis Mitsunaga's business partner, Rudy Alivado, and kept the money for herself instead of passing the money through to MAI. Otani's declaration stated, "At no point in time did [L.J.M.] ever give MAI money (cash, check, or otherwise) in connection with and/or related to the Rudy Alivado Residence Project." However, the declaration omitted the fact that Alivado was in a partnership with Mitsunaga whereby Alivado *did not pay* MAI for work done on his house.

McDonald's declaration—written as if he was a law enforcement officer—purported to set out the "facts and circumstances establishing probable cause" against L.J.M. In his declaration, McDonald states that L.J.M. "testified under oath" to certain admissions. For example, McDonald included the following alleged question and answer from the civil trial between L.J.M. and MAI:

---

[5] Indeed, the charging document was supported only by declarations from MAI employees—namely, Defendants Otani, McDonald, and Fujii—and about 1,800 pages of sundry exhibits supplied by MAI.

- "Q. [Y]ou were doing side jobs against company policy, in violation of company policy, correct?  A.  Yes."  *See* Exhibit "4", Transcript of Jury Trial Day 3 dated July 15, 2014 at 105:14-16.

This excerpted quote makes it appear that L.J.M. admitted she was doing side jobs against company policy. But the actual exchange was whether a *letter sent by Tanaka to L.J.M. said* L.J.M. was doing side jobs against company policy:

- Counsel:      [T]he letter was signed 'Very truly yours, Sheri J. Tanaka'; is that correct?
- L.J.M.:        Yes.
- Counsel:      The letter just does indicate that's prior to November 10th, in other words before November 10th, 2011, that you were doing side jobs against company policy, in violation of company policy, correct?
- L.J.M.:        Yes.

CV No. 12-00468-DKW, ECF No. 225 at 105.

In another selective excerpt, McDonald declares that L.J.M. "admitted that her own conduct, working for a competing architectural firm Jenken Architecture while she was employed by MAI, was 'weird' and 'unethical.'" In fact, just prior to McDonald's selected excerpt, L.J.M. had testified that she had never worked for Jenken Architecture while employed at MAI. And while L.J.M. said the words "weird and "unethical, maybe, possibly," that was in reference to signing an invoice once on behalf of Jenken Architecture's owner William Wong:

> I remember signing it for [Wong] because he was away. And the client wanted to make payment to him, because I think it had to do we have to make payment, can you -- or we want to cut the check. And so I said, oh, well, he's away, can you wait till he gets back? And he said – she said, oh, no. Well, you know, they're willing to write it now, so can you get an invoice or something from Bill Wong? So I called Bill, he says

6

can you write something on my behalf and just sign it for me? So that's what I did. And I knew the client so, once again, I did sign it on his behalf. And I put [L.J.M.] for Bill Wong, or something like that, Jenken Architecture. . . . So, yeah, Bill -- Bill said I could sign it for him. So he says to put your name and my company's name on it. So I believe I put [L.J.M.], Jenken Architecture for Bill Wong or something. I -- I know it was weird. It was unethical, maybe, possibly. I don't know if that was wrong but I did sign it for him.

CV No. 12-00468-DWK, ECF No. 226 at 74–75.

As another example, McDonald's declaration repeats the theme from Otani's declaration that L.J.M. "intentionally deceived Alivado into thinking that he was making payments to MAI, when she intended to keep the money for herself." As outlined previously, however, Alivado was in a business partnership with Dennis Mitsunaga and did not pay MAI for work performed.

Based on the charging packet presented by the DPA, a duty judge for the First Circuit Court issued a warrant of arrest for L.J.M. Before the warrant was executed in the traditional sense, L.J.M. surrendered to police on December 9, 2014. The corresponding police report states that L.J.M. was "[a]rrested and charged on the strength of a warrant of arrest[.]" *See* Exhibit 1. After being booked and released, L.J.M. made her initial appearance several days later.[6] She was placed on conditions of release, which included travel restrictions and a $20,000 bond. FSI ¶ 16.

The case against L.J.M. carried on for multiple years. Finally, in September 2017, the First Circuit Court entered a written order dismissing the felony

---

[6] Evidence will show that Tanaka came to L.J.M.'s initial appearance with a camera to record the event.

information with prejudice, "finding a lack of probable cause for the charges against L.J.M. and significant irregularities in the DPA's investigation and prosecution of L.J.M." FSI ¶ 17. For instance, in an order produced to defendants, the Court observed that the DPA's "participation was little more than acting as the recipient of, and conduit for, MAI's submissions." The Court further found that the investigation into L.J.M. was "striking[ly]" one-sided, and "highly unusual" given the lack of an outside investigating agency such as HPD. The Court found that "the flawed process and the flawed proof compromised the integrity of the charges against [L.J.M.]."

B.     The Charges

Based on these facts, and others, the grand jury charged Tanaka and her co-conspirators with two crimes:

First, the FSI charges a conspiracy to commit offenses against the United States, namely (1) honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, and (2) two forms of federal program bribery in violation of 18 U.S.C. §§ 666(a)(1)(B) and (a)(2). With respect to the honest services fraud, the FSI explicitly charges a "material scheme and artifice to defraud the City and County of Honolulu . . . of their right to the honest services of Kaneshiro through a quid pro quo bribery . . . ." FSI ¶ 20(1). Even if the totality of the FSI was not enough to make that quid pro quo agreement clear, the FSI explicitly defines it:

> In exchange for the campaign contributions given to him by [the conspirators and others], KANESHIRO would agree to take official

action and exercise his authority as the Prosecuting Attorney for the City and County of Honolulu to open an investigation into and prosecute former MAI employee L.J.M. The prosecution of L.J.M. continued until her case was dismissed with prejudice in a written order by Judge Karen T. Nakasone on September 15, 2017, and the time to appeal lapsed on or about October 15, 2017.

FSI ¶ 21(3).

Second, the FSI charges a conspiracy against rights, in violation of 18 U.S.C. § 241. Section 241 makes it a felony to "conspire to injure, oppress, threaten, or intimidate any person in any State, . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same[.]" 18 U.S.C. § 241. Section 241's language is "plain and unlimited" and "embraces all of the rights and privileges secured to citizens by all of the Constitution and all of the laws of the United States." *United States v. Price*, 383 U.S. 787, 800 (1966). Because the statute is intended to deal "with conspiracies to interfere with 'Federal rights, and with all Federal rights,'" it is given "a sweep as broad as its language." *Id.* at 801, 803. To that end, rights protected by Section 241 include:

- the right to be free from unreasonable search and seizure[7]
- the right to testify at a federal trial in response to a request or demand of a federal court[8]
- the right to the full and equal enjoyment of the accommodations of places of public accommodation, such as public parks[9]

---

[7] *United States v. Martinez-Mercado*, 919 F.3d 91 (1st Cir. 2019); *see also United States v. Epley*, 52 F.3d 571, 576 (6th Cir. 1995).

[8] *United States v. Pacelli*, 491 F.2d 1108 (2d Cir. 1974).

[9] *United States v. Allen*, 341 F.3d 870, 878 (9th Cir. 2003).

- the right to inform federal officials of violations of federal law[10]
- the right of one arrested and charged with a crime to a trial to resolve the question of his or her guilt[11]
- the right to equal protection of the laws, including the right to be free from false arrest based on race[12]

The basic elements of a Section 241 claim are:

1. An agreement between two or more persons to injure, oppress, threaten, or intimidate an individual (the "victim") in the free exercise or enjoyment of at least one of the victim's rights secured by the Constitution or laws of the United States;
2. The defendant knowingly became a member of the conspiracy with the intent to further the conspiracy; and
3. The victim was present in the State of Hawaii.

*See United States v. Kim*, 857 Fed. App'x 375, 375 (9th Cir. 2021) (unpublished)

("The district court's instructions here, adopted from a joint proposal by the parties, tracked the statutory language of sections 241 and 242 and included specific intent language requiring proof of a purpose to deprive the victim of a constitutional right, consistent with [*Screws v. United States*, 325 U.S. 91 (1945)]."); *United States v. Gonzalez*, 906 F.3d 784, 792 (9th Cir. 2018) ("In order to convict Gonzalez and Ayala of violating § 241 based on the first object of the charged conspiracy, the government had to prove: (1) that two or more persons agreed to deprive Carrillo of his right to be free from the use of excessive force, and (2) that Gonzalez and Ayala knowingly joined the agreement and intended to deprive Carrillo of his right to be free from the use of excessive force.").

---

[10] *United States v. Smith*, 623 F.2d 627 (9th Cir. 1980).
[11] *United States v. O'Dell*, 462 F.2d 224 (6th Cir. 1972).
[12] *United States v. Guest*, 383 U.S. 745, 756 (1966).

Here, the FSI alleges two objects of the § 241 conspiracy: to injure, oppress, threaten, and intimidate L.J.M. in the free exercise and enjoyment of: (1) "the right under the Fourth and Fourteenth Amendments to be free from unreasonable seizures by one acting under color of law"; and (2) the "right to file a lawsuit in federal court alleging claims under Title VII of the Civil Rights Act and the [ADEA.]" FSI ¶ 24. The theory underlying these objects is spelled out extensively in the FSI. L.J.M.'s investigation and prosecution—built with malice, bought with bribery, and bereft of probable cause—was an unmistakable conspiracy to subject L.J.M. to an unreasonable seizure, and was done to oppress and intimidate L.J.M. after she exercised her right to file a federal lawsuit against MAI.

## Legal Principles

Under Federal Rule of Criminal Procedure 7(f),

> The court may direct the government to file a bill of particulars. The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits. The government may amend a bill of particulars subject to such conditions as justice requires.

Fed. R. Crim. P. 7(f). The decision on a request for a bill of particulars rests in the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *Will v. United States*, 389 U.S. 90, 99 (1967).

A bill of particulars serves three functions: (1) to inform the defendant of the nature of the charges with sufficient precision to enable the defendant to prepare for trial; (2) to avoid or minimize the danger of surprise at the time of trial; and (3) to

11

protect against double jeopardy. *United States v. Ayers*, 924 F.2d 1468, 1483 (9th Cir. 1991); *United States v. Giese*, 597 F.2d 1170, 1180–81 (9th Cir. 1979). The key factor in deciding whether a bill of particulars is warranted is whether the defendant has been adequately advised of the charges. This can be done in a variety of ways, but is most commonly accomplished by reference to the indictment itself. *United States v. Robertson*, 15 F.3d 862, 873-874 (9th Cir. 1994), *rev'd on other grounds*, 514 U.S. 669 (1995). Within the Ninth Circuit, the use of a "bare bones" charging document employing the statutory language alone is permissible, so long as it clearly sets forth all the essential elements of the charged offense. *United States v. Crow*, 824 F.2d 761, 762 (9th Cir. 1987); *United States v. Awad*, 551 F.3d 930, 935 (9th Cir. 2009) (citations omitted) ("An indictment is sufficient if it contains 'the elements of the charged crime in adequate detail to inform the defendant of the charges and to enable him to plead double jeopardy.'"); *Robertson*, 15 F.3d at 873-874 (holding that a "bill of particulars was not necessary. . . because the indictment apprised [defendant] of the specific charges against him, thereby minimizing the danger of surprise at trial; aided him in preparing for trial; and protected him against double jeopardy.").

"The test for sufficiency of the indictment is 'not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *Id.* (quoting *United States v. Hinton*, 222 F.3d 664, 672 (9th Cir. 2000)). Where the indictment meets these minimal constitutional standards,

courts have denied motions for a bill of particulars. *See, e.g., United States v. Ramos-Lopez*, 349 Fed. App'x 166, 168 (9th Cir. 2009) (unpublished) (upholding the district court's denial of a bill of particulars where the defendant did not contest the sufficiency of the discovery and the indictment provided defendant with sufficient details of the charges); *United States v. Liew*, 2013 WL 2605126 (N.D. Cal. 2013) (unpublished) (denying bill of particulars in a bankruptcy fraud case where indictment sufficiently detailed the charges).

The Court may also look beyond the indictment in determining whether the defendant has been adequately advised of the charges and may consider "all other disclosures made by the government." *Giese*, 597 F.2d at 1180. "Full discovery will obviate the need for a bill of particulars." *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983) (citing cases); *see United States v. Mitchell*, 744 F.2d 701, 705 (9th Cir. 1984) ("The purposes are served if the indictment itself provides sufficient details of the charges and if the Government provides full discovery to the defense."). "The ultimate test in deciding whether a bill of particulars should be ordered is whether the information sought is necessary, as opposed to helpful, in preparing a defense." *United States v. Giffen*, 379 F. Supp. 2d 337, 346 (S.D.N.Y. 2004).

Significantly, a defendant may not use a motion for bill of particulars to obtain an explanation of the United States' evidence at trial. *See Giese*, 597 F.2d at 1181 (concluding court did not abuse its discretion in denying motion for bill of particulars

13

seeking "when, where and how" of every act in furtherance of a conspiracy, when indictment and discovery provided defendant with information sufficient to meet purposes of a bill of particulars). That is because "[a] defendant is not entitled to know all the evidence the government intends to produce but only the theory of the government's case." *United States v. Ryland*, 806 F.2d 941, 942 (9th Cir. 1986). The defendant's right is to know the offense with which she is charged, not the details of how it will be proved. *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981); *see also Ryland*, 806 F.2d at 942 (9th Cir. 1986) (denying a bill of particulars and holding that the defendant "is not entitled to know the content of the testimony of each of the government witnesses before trial"); *United States v. Folsom*, 414 Fed. App'x 95 (9th Cir. 2011) (unpublished) (holding that the district court did not abuse its discretion in denying defendant's motion for a bill of particulars where defendant sought to compel the government to prove its theory); *United States v. Grace*, 401 F. Supp.2d 1103, 1114-15 (D. Mont. 2005) (denying a motion for a bill of particulars and holding that the defendants were entitled to know the government's theory, but they were not entitled to force the government to show in advance of trial through a bill of particulars that it can prove the theory). To that end, "[a] bill of particulars is not warranted to obtain the names of unknown co-conspirators, the exact nature of overt acts, or the precise timing of the alleged conspiracy." *United States v. Shiraishi*, No. CR 17-00582-JMS, 2018 WL 3370522, at *1 (D. Haw. July 10, 2018) (citing

*United States v. DiCesare*, 765 F.2d 890, 897 (9th Cir.), amended, 777 F.2d 543 (9th Cir. 1985)).

Argument

Tanaka's motion should be denied. The FSI goes beyond what is necessary to provide Tanaka with notice of the charges against her and the United States' theory underlying the charges. That alone forecloses the need for a bill of particulars. The motion itself reveals more reasons why Tanaka's request is improper: It is partly an improper attempt to obtain a roadmap of the United States' trial evidence, partly an attempt to raise legal challenges to the FSI, and partly an attempt to compel the United States to respond to alleged defenses. None of those are valid reasons for a bill of particulars.

A.     The FSI Provides Tanaka Sufficient Notice of the Conspiracy Against Rights

1.     Tanaka first requests an order requiring the United States to "describe the 'seizures' . . . referenced in [the Count 2 conspiracy against rights under 18 U.S.C. § 241]." ECF No. 103-1 at 6. She claims the FSI "fails to identify any facts which if proven would establish a 'seizure' under the Fourth or Fourteenth Amendments." *Id.* at 8. She is mistaken on multiple fronts.

At the outset, that is not a bill of particulars request at all—it is a disguised motion to dismiss for failure to state a claim. On that basis alone, this request should be denied. The merits of the claim fare no better. The charge is a *conspiracy* to injure, oppose, threaten, and intimidate L.J.M.'s right to be free from unreasonable seizures.

15

Black-letter conspiracy law, of course, does not require a completed object,[13] and here the obvious import from the allegations in the FSI is the defendants' intention to affect a seizure by way of a criminal prosecution, which would naturally begin with an arrest, include pretrial restrictions of liberty, and reach all the way up to a conviction with concomitant criminal punishments. In short, the conspirators tried to buy a prosecution that was not based on probable cause, a quintessential effort to have someone unreasonably seized. Moreover, even while an actual completed seizure is not required for the conspiracy charge, L.J.M. was subjected to multiple unreasonable seizures by virtue of the conspirators' acts. First, she was arrested and booked by the police department pursuant to an arrest warrant. *See* Exhibit 1. Second, L.J.M.'s freedom of movement was restrained by virtue of the conditions of release set in her case (including travel restrictions, FSI ¶ 16).[14] Third, a $20,000 cash bond—a property seizure—was required as part of her conditions of release.

---

[13] *See, e.g., United States v. Monroe*, 552 F.2d 860, 862 (9th Cir. 1977) ("The crime of conspiracy is established once there is an agreement to engage in criminal activity and one or more overt acts are taken to implement the agreement."); 9th Cir. Model Jury Instr. 11.1.

[14] *See United States v. Jacobsen*, 466 U.S. 109, 114 n.5 (1984) (a "seizure" occurs whether there is "meaningful interference, however brief, with an individual's freedom of movement"); *United States v. Enslin*, 327 F.3d 788, 795 (9th Cir. 2003) ("The appropriate inquiry is whether the marshals' order 'in some way restrain[ed]' Enslin's liberty such that a reasonable person under the circumstances would not have felt free to disregard the order."); *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) ("Even pretrial release may be accompanied by burdensome conditions that effect a significant restraint of liberty.").

*Id.*[15] That a court set the conditions does not undermine the conspirators' agreement. Tanaka appears to disagree with this, but factual or legal disagreement is not a basis for a bill of particulars.

2.    Next, Tanaka claims the FSI "fails to identify with particularity the source of the right 'to file a lawsuit in federal court alleging claims under Title VII of the Civil Rights Act and the [ADEA.]'" ECF No. 103-1 at 13. But the FSI is clear: L.J.M. had a "right to file a lawsuit in federal court alleging claims under Title VII of the Civil Rights Act and the [ADEA.]" FSI ¶ 24. The source of the right is identified right there: Title VII of the Civil Rights Act and the ADEA.[16] Those acts (unsurprisingly) give teeth to their anti-discrimination provisions by giving aggrieved employees the right to file civil lawsuits for employment discrimination. *See, e.g.,* 29 U.S.C. § 626(c) (ADEA: "[a]ny person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter"); 42 U.S.C. § 2000e-5(f) (providing for the filing of a civil action by "person claiming to be aggrieved" by unlawful employment

---

[15] *See Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 61 450 (1992) ("A 'seizure' of property, we have explained, occurs when "there is some meaningful interference with an individual's possessory interests in that property.")

[16] Tanaka raises a confusing, hyper-technical complaint about the placement of the word "under." ECF No. 103-1 at 10. But this case does not involve interpretation of abstruse statutory text. The question is simply whether Tanaka is capable of understanding the charges based on a natural reading of the indictment. As an attorney, and represented by three others, she should be. *United States v. Anderson*, 532 F.2d 1218, 1222 (9th Cir. 1976) ("[A]n indictment is not to be read in a technical manner, but is to be construed according to common sense with an appreciation of existing realities.").

activity). These are "laws of the United States," confirming a right to seek relief for employment discrimination, squarely within the broad reach of Section 241. *See Price*, 383 U.S. at 800 (Section 241's language is "plain and unlimited" and "embraces all of the rights and privileges secured to citizens by all of the Constitution and all of the laws of the United States"). And retaliating against L.J.M. for having exercised that right—using an investigation and prosecution as the tool— also falls squarely within the reach of Section 241. *See e.g.*, *Allen*, 341 F.3d at 890– 91 (affirming § 241 conviction based on a conspiracy to injure, oppress, threaten, and intimidate certain minorities in the free exercise and enjoyment of the "right to full and equal enjoyment of the . . . accommodations of any public of public accommodation without discrimination"); *Pacelli*, 491 F.2d at 1113 ("Our federal government has a particular interest in assuring a prospective witness that he or she will be free to respond by attending the trial of a federal indictment as a witness without being prevented from doing so by threats, molestation or force.").

B.    The FSI Provides Tanaka Sufficient Notice of the Conspiracy to
      Commit Honest Services Fraud

Tanaka next claims Count 1 fails to allege with particularity a conspiracy to commit honest services fraud. Specifically, she claims the FSI "fails to describe with particularity the official act which if proven would be a[] part of [a] *quid quo pro*." ECF No. 103-1 at 15. Again, this is simply an effort to require the United States to spell out its trial evidence or delineate all overt acts in furtherance of the conspiracy—not a purpose of a bill of particulars. *See Ryland*, 806 F.2d at 942. In

any event, the FSI could not be clearer as to the *quid pro quo*, most specifically here: "In exchange for the campaign contributions given to him by [the conspirators and others] KANESHIRO would agree to take official action and exercise his authority as the Prosecuting Attorney for the City and County of Honolulu to open an investigation into and prosecute former MAI employee L.J.M." FSI ¶ 21(3). Those are core prosecutorial actions. And to steer through the malicious investigation and prosecution, Kaneshiro met personally with Mitsunaga and Tanaka, FSI ¶¶ 22(3), (10), solicited information about L.J.M. from them, FSI ¶¶ 22(4), (8), (13), (24), reassigned L.J.M.'s case from one prosecutor to another (when the first recommended declining it), FSI ¶ 22(27), assigned an investigator to sign an affidavit after the state court rejected the original felony information against L.J.M., FSI ¶ 40, and advised he wanted to appeal the dismissal of L.J.M.'s case, FSI ¶ 50. Official action permeates this conspiracy.

Tanaka also demands the "dates on which [the official acts] occurred." ECF No. 103-1 at 17. But that is expressly *not* a purpose of a bill of particulars. *See DiCesare*, 765 F.2d at 897 (bill of particulars not warranted to "determine the exact date on which the conspiracy allegedly began"). In any event, as for the date of the conspiracy, the FSI alleges a specific date range: "beginning in or around October 2012, and continuing through in or around October 2017[.]" FSI ¶¶ 20, 24. Moreover, the United States has provided extensive discovery to the defendants— with much material provided much early than required (such as extensive *Jencks*

material). As the caselaw makes clear, "[f]ull discovery will obviate the need for a bill of particulars." *Long*, 706 F.2d at 1054. That is the case here, even beyond a sufficiently detailed indictment.

   C.   **The Indictment Need Not Spell Out Every False Statement Made by the Conspirators**

Finally, Tanaka seeks a bill of particulars requiring the United States to describe the misstatements and material omissions in declarations supplied by conspirators to support L.J.M.'s prosecution, as outlined in overt acts 34 and 36. This is a nonstarter. The FSI alleges 52 overt acts. Only one needs to be proven at trial. *United States v. Lyman*, 592 F.2d 496, 500 (9th Cir. 1978) ("Among the elements required to support a conspiracy conviction is proof of only one overt act in furtherance of the illegal purpose."). Moreover, "[t]he rule is well established that the government in a conspiracy case may submit proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts alleged in the indictment." *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011); *DiCesare*, 765 F.2d at 897 (bill of particulars not warranted for purposes of requiring government "to delineate all other overt acts that comprised the charged activity"). Tanaka's request wrongly seeks to require the United States to show its trial evidence now. *See Ryland*, 806 F.2d at 942 ("A defendant is not entitled to know all the evidence the government intends to produce but only the theory of the government's case.").

Nonetheless, while not required, the United States has highlighted material misstatements and omissions in Otani and McDonald's declarations in the factual

background above. It is not possible to provide a list of all false statements made by the conspirators in their declarations and elsewhere in furtherance of the conspiracy—the discovery produced will appraise Tanaka of that. With respect to discovery, the United States has produced approximately 113 GB of data over three rounds, including over 100 grand jury transcripts, e-mails between Tanaka and the DPA, certified records of L.J.M.'s case file from the First Circuit Court, certified records from various phone providers, hundreds of reports and grand jury exhibits, and more. To facilitate review of discovery produced, the United States has also provided a detailed index to accompany each discovery round.

"Full discovery will obviate the need for a bill of particulars." *Long*, 706 F.2d at 1054. That is true of this case. Between robust discovery, a robust indictment, a clear theory of prosecution, and—even while not necessary—additional background information provided here, there is no basis for a bill of particulars.

//

//

//

//

//

//

//

//

Conclusion

The Court should deny Tanaka's motion.

Dated: November 9, 2022

Respectfully submitted,
MERRICK B. GARLAND
Attorney General
RANDY S. GROSSMAN
United States Attorney

*/s/ Colin M. McDonald*
MICHAEL G. WHEAT
JOSEPH J.M. ORABONA
JANAKI G. CHOPRA
COLIN M. MCDONALD
ANDREW Y. CHIANG
Special Attorneys

UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 22-00048-JMS-WRP-6 |
| Plaintiff, | CERTIFICATE OF SERVICE |
| v. | |
| KEITH MITSUYOSHI KANESHIRO (1), DENNIS KUNIYUKI MITSUNAGA (2), TERRI ANN OTANI (3), AARON SHUNICHI FUJII (4), CHAD MICHAEL MCDONALD (5), SHERI JEAN TANAKA (6), | |
| Defendants. | |

IT IS HEREBY CERTIFIED that:

I, Colin M. McDonald, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, CA 92101-8893. I am not a party to the above-entitled action. I have caused service of the foregoing on all parties in this case by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 9, 2022.        */s/ Colin M. McDonald*
                                      COLIN M. MCDONALD

23