MERRICK B. GARLAND
Attorney General
MICHAEL G. WHEAT, CBN 118598
JOSEPH J.M. ORABONA, CBN 223317
JANAKI G. CHOPRA, CBN 272246
COLIN M. MCDONALD, CBN 286561
ANDREW Y. CHIANG, NYBN 4765012
Special Attorneys of the United States
880 Front Street, Room 6293
San Diego, CA 92101
619-546-8437/7951/8817/9144/8756
Andrew.Chiang@usdoj.gov

Attorneys for the United States of America

## UNITED STATES DISTRICT COURT
### DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                   Plaintiff,<br>    v.<br><br>KEITH MITSUYOSHI KANESHIRO (1),<br>DENNIS KUNIYUKI MITSUNAGA (2),<br>TERRI ANN OTANI (3),<br>AARON SHUNICHI FUJII (4),<br>CHAD MICHAEL MCDONALD (5),<br>SHERI JEAN TANAKA (6),<br><br>                   Defendants. | CR No. 22-00048-JMS<br><br>UNITED STATES' MOTION IN LIMINE NO. 4: TO ADMIT EVIDENCE OF MAI'S EXTENSIVE POLITICAL DONATION APPARATUS |

### INTRODUCTION

The United States hereby moves in limine to introduce evidence of the defendants' and their affiliates' prolific history of political donations. As outlined below, MAI has a well-established process (the "MAI donor apparatus") for steering significant amounts of donations to political campaigns to exert influence. The MAI

1

donor apparatus was activated in this case, depositing nearly $50,000 into Keith Kaneshiro's campaign coffers—nearing 40% of all donations received by Kaneshiro during the period of L.J.M.'s investigation and prosecution—to buy a criminal case against L.J.M. Evidence of the MAI donor apparatus is centrally relevant and critical for explaining why various individuals were suddenly drawn to start giving donations to Kaneshiro in 2012. The evidence further contextualizes the MAI defendants' knowledge, actions, and intent to harass and maliciously prosecute L.J.M.

## BACKGROUND

As evidenced by the First Superseding Indictment ("FSI"), the United States intends to prove that the MAI defendants conspired to bribe Kaneshiro through the use of bundled political contributions in exchange for prosecuting L.J.M. Political contributions made simultaneously by the MAI defendants, their immediate families, employees, and affiliates to Kaneshiro are direct overt acts in support of the conspiracy. Tellingly, the MAI defendants also made contributions to other politicians using the same *modus operandi* as alleged in the charged conspiracy. That is, the MAI defendants used their well-established contribution scheme to donate to politicians with whom future building projects would be considered and approved, such as Ann Kobayashi, Benjamin Cayetano,[1] Neil Abercrombie, Kirk Caldwell,

---

[1] For example, the United States has produced a summary chart of contributions to Cayetano for Mayor in 2012, which shows that MAI Donors made substantial contributions to the Cayetano campaign on the same date in May 2012. In April 2012, Defendant Mitsunaga (as Cayetano's finance chair) sent a fundraising letter telling potential contributors the "legal limit is $4,000 per person per election cycle"

2

and Colleen Hanabusa, with bundled donations reported on the same dates between November 2006 and December 31, 2020. This process of contributing was nearly identical to the manner in which the MAI defendants, employees, and affiliates made simultaneous, concerted contributions to Kaneshiro. Of course, the only difference was that MAI had no existing, pending, or future engineering or architectural work with Kaneshiro or the Office of the Prosecuting Attorney.

Furthermore, evidence of the defendants' contributions to other elected officials will show MAI's use of bundled political contributions, including through straw donors, similar to how they contributed to Kaneshiro. For example, the defendants' annual compensation, when compared to the full scope of their political contributions to Kaneshiro and others, will demonstrate the implausibility of the defendants' – namely, Otani, Fujii, and McDonald – ability to afford such contributions, and the reason they had to funnel contributions through family members and MAI affiliates. Additionally, contributions made by Otani in the name of the "A" family (i.e., J.H., R.A., and J.A.) to Kaneshiro and others will demonstrate that while these contributions were made in their names, they had no knowledge of them and Otani's income would not support Otani as the true source of the funds.

---

and to "call Terri Otani…if you have any questions or if you would like to have the checks picked up." Ex. 1. This shows Mitsunaga's knowledge of campaign finance laws—such as campaign contribution limits—and MAI's practice of picking up donations from donors to deliver them directly to campaigns.

Relatedly, on September 21, 2017, an accountant for MAI received a check, signed by Arnold Koya (a MAI executive) and defendant McDonald, in the amount of $6,350, to make a $6,000 political contribution at MAI's request. According to the accountant, he deposited the check into his bank account and thereafter made a maximum contribution of $6,000 to the campaign of Colleen Hanabusa. The accountant further admitted that he received $350 from MAI to pay the general excise taxes for making this political contribution at the request of Mitsunaga.

MAI subcontractors and business affiliates were also part of the MAI donation apparatus. As outlined in the FSI, MAI subcontractor S.K.H. and his spouse were among the donors to Kaneshiro. FSI ¶ 22(17). S.K.H. is expected to testify that Defendant Fujii asked S.K.H. to donate to Kaneshiro's campaign. S.K.H. has given to various campaigns at the behest of MAI—over $100,000 in contributions (bundled with contemporaneous contributions from MAI employees/affiliates) are connected to S.K.H., his wife, daughter, niece, and co-owner of his company, G.Y. According to S.K.H. he would donate when requested by MAI and "hope" to be on their "good side" and "hope" to continue receiving contracts from MAI.

C.T. is another subcontractor for MAI. He donated $1,000 to Kaneshiro's campaign in October 2012. A sizable percentage of C.T.'s business comes from Mitsunaga-affiliated businesses. The person related to Mitsunaga who would tap his shoulder for donations was G.O., the president of a separate Mitsunaga company, Mitsunaga Construction, for which Dennis Mitsunaga served as CEO and majority

4

owner. According to C.T., when doing work with Mitsunaga, it was "pretty much sort of understood that, you know, if you want to continue doing or have the opportunity to bid on their projects, that it [giving] was expected of you."

The MAI donation apparatus is inextricably intertwined with the charged conspiracy. Why would various people suddenly start giving to Kaneshiro's campaign? It was not organic. It was not grassroots campaigning. It was not because Kaneshiro was tough on crime. It was because MAI tapped them—like it had before.

## DISCUSSION

1. *The donations to Kaneshiro—and the reasons why the contributions were given—constitute direct evidence of the charged conspiracy.*

As charged in the FSI, the "MAI Donors"—the defendants, other MAI employees, spouses, subcontractors, and affiliates—contributed approximately over $45,000 to Kaneshiro. *See* FSI ¶ 12. The donations made to Kaneshiro's campaign are direct evidence of the charged conspiracy—they are the *quid* flowing to Kaneshiro in exchange for L.J.M.'s investigation and prosecution. Witnesses who donated are expected to testify why they gave to Kaneshiro—explaining that they did so ultimately due to a request from MAI. This is direct evidence of the conspiracy—and it brings into sharp focus the MAI donation apparatus.

2. *The lack of prior donations to Kaneshiro—or any prosecutor—directly proves the charged conspiracy.*

As the FSI alleges, prior to October 2012, the MAI Donors had no known contributions to Kaneshiro. FSI ¶ 12. In fact, campaign spending records will show

5

that—as far back as records go—the MAI Donors had *never* given to a candidate for the Honolulu Prosecutor's Office, despite significant giving to other candidates. Rather, the MAI Donors started giving to Kaneshiro three weeks after Mitsunaga and Tanaka met with Kaneshiro to convince Kaneshiro to investigate and prosecute L.J.M. *See* FSI ¶ 12. The prior history of the MAI Donors' contributions to other politicians, but the absence of any to a prosecutor, proves the conspirators were buying a prosecution. Accordingly, the MAI Donors' prior contribution history directly proves the charged conspiracy and is admissible.

    3.    *The background on the MAI donation apparatus is inextricably intertwined with the charged offenses*.

Beyond the direct donations to Kaneshiro, the details underlying the MAI donation apparatus—including donations to other candidates—is necessary to explain the sudden surge of donations to Kaneshiro. In other words, this background is inextricably intertwined with the charged offenses. This doctrine applies when "(1) particular acts of the defendant are part of a single criminal transaction, or when (2) other act evidence is necessary to admit in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *United States v. Wells*, 879 F.3d 900, 928 (9th Cir. 2018). The second prong applies here. Without the background knowledge of the MAI donation apparatus—which allows MAI to "overcome campaign contribution limits and increase the amount of money funneled" to political campaigns, FSI ¶ 21(2)—the jury will be left asking, "why

would all these people agree to start giving to Keith Kaneshiro?" The answer is that MAI had a well-established playbook of tapping employees, spouses, subcontractors, etc., to direct money to certain candidates. And as set forth above, when Mitsunaga came calling, the money flowed—explaining the sudden surge of donations to Kaneshiro, some from people who knew about the conspiracy against L.J.M. and some from people who did not.

Circuit caselaw supports application of the "inextricably intertwined" doctrine here. *See, e.g., United States v. Daly*, 974 F.2d 1215, 1217 (9th Cir. 1992) ("A jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge."); *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1013 (9th Cir. 1995) ("[I]t is obviously necessary in certain cases for the government to explain either the circumstances under which particular evidence was obtained or the events surrounding the commission of the crime."); *United States v. DeGeorge*, 380 F.3d 1203, 1220 (9th Cir. 2003) (evidence of prior losses in a fraudulent scheme was inextricably intertwined with the charged offense because they "had an important factual connection to several counts contained in the indictment"; "[t]he jury would not have understood the relevance of the transactions and concealment without hearing at least some explanation for why DeGeorge could not obtain insurance in his own name" and thus evidence of

7

prior losses were necessary to "permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime.").

Here, the underlying facts of the MAI donation apparatus are necessary "in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Wells*, 879 F.3d at 928.

4. *Donations to Ann Kobayashi, specifically, are inextricably intertwined.*

The broker of the initial meeting between Kaneshiro and Mitsunaga was former Honolulu City Council member Ann Kobayashi. On September 28, 2012, Kaneshiro's Executive Assistant ("EA-1") emailed Defendant Otani the following: "I received a call from Councilmember Ann Kobayashi this morning regarding a meeting with Keith and Dennis. Keith is happy to meet with him. Please give me a call so that I can get a little more information." At that time, it was publicly known that Kobayashi had received donations from members of MAI, including McDonald, McDonald's spouse, Otani, and Mitsunaga's son, B.M. *See, e.g.,* Defense Amended Exhibit F, ECF No. 295-1 at 5. That history explains why Kobayashi would be willing to broker the meeting—and why Kaneshiro would be willing to pick up the phone.[2] Moreover, *after* Kobayashi brokered the meeting, she got even more money from the MAI donors, including thousands of dollars from Mitsunaga and his wife. *See id.* Otani even threw a fundraiser for Kobayashi in 2015, which apparently netted

---

[2] According to EA-1, it was very rare for a private citizen to get a private audience with Kaneshiro. As far as she could recall, it only happened one other time.

8

donations from defendants McDonald, Mitsunaga, Otani, Tanaka, and a sham $500 donation from Otani's niece (J.H.). In other words, after Kobayashi brokered the meeting between Mitsunaga and Kaneshiro, she received bountiful donations from MAI donors. The evidence of MAI's history of giving towards Kobayashi is inextricably intertwined with the story underlying the onset and progression of the MAI defendants' corrupt relationship with Kaneshiro.

    5.    *Independently, the MAI donor apparatus is admissible under FRE 404(b).*

The MAI donor apparatus is also admissible under FRE 404(b). This evidence is not being offered for any propensity purpose. To the contrary, the evidence establishes MAI's well-trod process—its *modus operandi*—for expanding the available pool of money for a given political candidate beyond the contribution limits. Based on campaign spending records, part of MAI's *modus operandi* was to collect checks and then give them to campaigns in batches (where they are then reported together). Why? Because that left no doubt as to who was responsible for each donation: while a check may have listed a subcontractor's name, it was really from MAI. The same approach was utilized in this case, with clear batches of donations made to Kaneshiro. *See* FSI ¶¶ 22(5), (12), (17), (43), (44), (45), (47).

The four-part admissibility test under Rule 404(b) is satisfied. *See United States v. Beckman*, 298 F.3d 788, 794 (9th Cir. 2002). First, the evidence "tends to prove a material point in issue," as described above. Second, the evidence "is not too

9

remote in time." The charged conspiracy dates back to October 2012, *see* FSI ¶ 20, which is squarely in the midst of contributions to other politicians. *See, e.g.,* Defense Exhibit F, ECF No. 295-1 (showing expansive donations spanning back to 2008). Third, the coordination of bundling contributions to Kaneshiro and others will be proven with substantial evidence, including campaign records, financial records, and witness testimony from subcontractors, business affiliates, family members, and others. Fourth, as for intent, the manner and means of the underlying contributions mirrors the manner and means employed to frame L.J.M., as discussed above.

      6.    *Rule 403 does not preclude this evidence*

The probative value of the proffered evidence is not "substantially outweighed" by any Rule 403 concern. The MAI donor apparatus, as outlined above, is highly probative evidence of the conspiracy against L.J.M. *See Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1344 (3d Cir. 2002) (highly probative evidence is "exceptionally difficult to exclude"). There is no risk of "unfair" prejudice—the defendants' operational tactics for framing L.J.M. is an entirely proper basis for the jury to base its reasoning. Nor can this evidence—critical to understanding the conspiracy—constitute undue delay or a waste of time. In the event any evidence is admitted solely under Rule 404(b), the Court can effectively limit any risk of unfair prejudice by giving an appropriate limiting instruction. *See* Fed. R. Evid. 105.

## CONCLUSION

The United States' fifth motion in limine should be granted.

Dated: January 22, 2024.                    Respectfully submitted,

                                            MERRICK B. GARLAND
                                            Attorney General


                                            */s/ Andrew Y. Chiang*
                                            MICHAEL G. WHEAT
                                            JOSEPH J.M. ORABONA
                                            JANAKI G. CHOPRA
                                            COLIN M. MCDONALD
                                            ANDREW Y. CHIANG
                                            Special Attorneys of the United States

11

# UNITED STATES DISTRICT COURT

## DIRICT OF HAWAII

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>KEITH MITSUYOSHI KANESHIRO (1),<br>DENNIS KUNIYUKI MITSUNAGA (2),<br>TERRI ANN OTANI (3),<br>AARON SHUNICHI FUJII (4),<br>CHAD MICHAEL MCDONALD (5),<br>SHERI JEAN TANAKA (6),<br><br>　　　　　　Defendants. | CR No. 22-00048-JMS<br><br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED that:

I, Andrew Y. Chiang, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, CA 92101-8893. I am not a party to the above-entitled action. I have caused service of the foregoing on all parties in this case by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 22, 2024.　　　　/s/ Andrew Y. Chiang
　　　　　　　　　　　　　　　　　　　　ANDREW Y. CHIANG

12